UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

DEBRA SCHATZKI and BPP WEALTH, INC.,

                       Plaintiffs,

   -against-


WEISER CAPITAL MANAGEMENT, LLC,
WEISERMAZARS, LLP and HOITSZ (a/k/a
"CARIJN") MICHEL,

                       Defendants.

------------------------------------------X

A P P E A R A N C E S:

10 Civ. 4685

OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1-19-12

        <u>Attorneys for Plaintiffs</u>

        LAWLER MAHON & ROONEY LLP
        36 West 44th Street, Suite 1400
        New York, NY  10036
        By:  Albert K. Lawler, Esq.

        CASEY, MAHON & ROONEY, LLP
        450 Seventh Avenue, Suite 2107
        New York, NY  10123
        By:  Christopher S. Rooney, Esq.


        <u>Attorney for Defendants</u>

        STARK & STARK, P.C.
        993 Lenox Drive, Building 2
        P.O. Box 5315
        Lawrenceville, NJ  08648
        By:  Scott Ian Unger, Esq.

**Sweet, D.J.**

Plaintiffs Debra Schatzki ("Schatzki") and BPP Wealth, Inc. ("BPP") (collectively, the "Plaintiffs") have filed a Second Amended Complaint (the "SAC") alleging five counts against Defendants Weiser Capital Management, LLC ("WCM"), WeiserMazars, LLP ("Weiser") and Hoitsz Michel ("Michel") (collectively, the "Defendants").  The Defendants have moved pursuant to Fed. R. Civ. P. 56 for partial summary judgment, seeking dismissal of Count II (Conversion) and Count V (Civil Conspiracy) of the SAC as well as dismissal of Plaintiffs' claims in Count IV that they are entitled to receive future renewal insurance commissions and severance.  The Plaintiffs, in addition to opposing the Defendants motion, have filed their own motion seeking partial summary judgment on the SAC's conversion count.  Upon the facts and conclusions set forth below, the Defendants' motion for summary judgment is granted in part, and the Plaintiffs' motion for summary judgment is denied.

**Prior Proceedings**

On June 10, 2010, the Plaintiffs filed a Verified Complaint along with an ex parte order to show cause in the

1

Supreme Court of the State of New York, County of New York.  The
case was removed to the United States District Court for the
Southern District of New York on June 16, 2010.  On December 10,
2010, the Defendants filed a motion to dismiss the civil
conspiracy count of the Original Complaint.  On January 10,
2011, the Plaintiffs filed an Amended Complaint which preserved
the civil conspiracy claim along with the Defendants' motion to
dismiss.  In an order dated January 26, 2011, the Defendants'
motion to dismiss the civil conspiracy claim was denied.  On
August 4, 2011, the Plaintiffs filed their Second Amended
Complaint ("SAC"), alleging five claims against the Defendants,
including trademark infringement against WCM, conversion against
all Defendants, two counts of breach of contract against WCM and
civil conspiracy against all Defendants.

On August 18, 2011, the Defendants filed their motion
for partial summary judgment, seeking dismissal of the SAC's
claims for conversion and civil conspiracy as well as dismissal
of claims seeking future renewal insurance commissions and
severance.  On September 8, 2011, the Plaintiffs filed their
opposition and cross motion seeking summary judgment on the
SAC's conversion claim.  Both motions were marked fully
submitted on September 21, 2011.

2

**The Facts**

The facts, as set forth in both the Plaintiffs' and Defendants' Local Rule 56.1 Statements of Undisputed Material Facts, are not in dispute except as noted below.

Schatzki, a financial planning professional domiciled in New Jersey who has worked in the financial services industry for thirty years, is the majority shareholder and president of BPP, a closely held corporation organized and existing under the laws of the State of New York.  Schatzki is a certified financial planner, chartered life underwriter and accredited estate planner who also holds Series 6, 63 and 65 and life and health insurance licenses.  Weiser, a limited liability partnership organized in New York, is an accounting firm, of which WCM, a limited liability company organized under New York law, is a subsidiary.  Michel, a New York domiciliary, was an employee of BPP and is currently an employee of WCM.

Over the course of her career, Schatzki developed a large portfolio of clients and prospective clients comprised principally of high net-worth individuals, as well as several

3

businesses.  Schatzki provides an array of financial planning services to these clients, including life, health and long term care insurance, and financial planning and investment advisory services.  In 2000, Schatzki became affiliated with the accounting firm of Marcum & Kliegman LLP ("M&K") and ultimately became head of M&K's financial services subsidiaries.  M&K subsidiaries provided financial planning, insurance and investment services to Schatzki's clients, clients of other members of the team and clients referred by M&K partners.  In 2002, Schatzki formed BPP, which holds an insurance brokerage license and provides insurance and financial planning services for wealthy individuals and consulting services for accounting firms.  BPP stands for "Building, Protecting and Preserving Wealth for Generations," and this tagline is a registered service mark of the corporation.  While Schatzki was still associated with M&K, she and BPP also provided financial planning services to clients of other accounting firms.

In the summer of 2007, Schatzki and Michel, who was employed at BPP at the time, had a series of meetings with employees of Weiser and WCM.  During the course of those meetings, Schatzki discussed the possibility of her and her team joining WCM.  Schatzki officially joined WCM on October 1, 2007.

4

The parties agree that Schatzki could have quit her employment
with WCM at any time, be fired at any time and was subject to no
restrictive covenants.  The Plaintiffs contend that BPP agreed
to permit WCM to use its intellectual property, including its
trademarks and client information (which, as described below,
was gathered electronically in a "SmartOffice" database), in
exchange for a 10% override on commissions and fees earned by
the Schatzki team.  The Defendants deny this contention, stating
that WCM did not agree to pay BPP a 10% override.  The parties
agree that Schatzki's clients were free to terminate their
relationships with Schatzki at any time.  According to the
Defendants, Schatzki did not have a formal, written employment
contract with WCM and was an at-will employee.  According to the
Plaintiffs, WCM's attorneys prepared, reviewed and redrafted
agreements that included the 10% override on generated
commissions and fees.  These agreements were made available to
Michel, but signed copies of these agreements have not been
produced by the Defendants and Schatzki does not remember
whether she actually signed these agreements.  After Schatzki
joined WCM, WCM gave Schatzki and her team access to all of the
client information relating to WCM's clients.

In the insurance industry, when a commission is earned on the sale of a policy, a large part of the commission is paid within a few months, but parts of the commission are often paid over a period of years.  These commissions are called "residual" or "trail" commissions.  When an insurance client signs a new insurance policy upon expiration of an old term policy, this new policy is called a renewal policy, and the seller receives a "renewal" commission.  According to the Plaintiffs, Schatzki generated initial and trial commissions for her sales of insurance policies while at WCM through May 2010.  According to the Defendants, all trail commissions were assigned to WCM.  The Plaintiffs contends that as part of WCM's operations both initial and trial commissions were paid to WCM rather than directly to the agent or agents who made the sale, and WCM then gave the agent the agreed percentage split of commissions.  The Defendants acknowledge that both initial and trail commissions were paid to WCM rather than the agent who made the sale and that WCM did not then give the agent a percentage split because all commissions were assigned to WCM.

The Plaintiffs state that Schatzki began using a data management service that is now known as "SmartOffice" over 20 years ago to store all the contact information for clients,

6

prospects or contacts, including information such as notes of conversations and copies of policies along with personal contact information for business clients, cell phone numbers and email addresses.  According to the Defendants, when Schatzki joined M&K in 2000, she brought the SmartOffice license to M&K. According to the Defendants, when Schatzki joined M&K in 2000, she was using a predecessor program to SmartOffice, and she did not assign the license to M&K.  Instead, the license remained with Schatzki and companies she owned which permitted use of the data and other intellectual property by M&K for a 10% override on income from commissions and fees.  The parties agree that M&K reimbursed Schatzki or BPP for the monthly SmartOffice licensing fees while she was an M&K employee.  Every M&K employee who worked for Schatzki utilized SmartOffice.

After Schatzki joined WCM in October 2007, WCM reimbursed Schatzki or BPP for the monthly SmartOffice licensing fees during the course of Schatzki's employment with WCM. During the course of Schatzki's employment with WCM, Schatzki as well as other employees continued to populate the SmartOffice database.  WCM employees, including the BPP team that reported to Schatzki while at M&K and employees who reported to Schatzki at WCM, were given access to the SmartOffice database.  Schatzki

7

made SmartOffice available to everyone within WCM who was using

BPP processes.  There were no written confidentiality agreements

between Schatzki and any of the people who were using

SmartOffice.  According the Defendants, BPP permitted WCM to

use its intellectual property.  According to the Plaintiffs, WCM

and BPP entered into an agreement whereby BPP granted WCM a

license to use its intellectual property, and WCM agreed to pay

BPP a 10% override on commissions and fees generated by the

Schatzki team.  Schatzki never had any WCM employee sign any

non-compete or confidentiality agreements, and Schatzki never

prohibited anyone from contacting her clients when she was

employed by WCM.  There were approximately 12,500 entries in the

SmartOffice database.


On May 3, 2010, Schatzki's employment with WCM was

terminated.  Schatzki demanded that WCM provide her with her

client files, both paper and electronic.  According to the

Plaintiffs, WCM prohibited Schatzki from removing these files

from her office.  The Defendants state that Schatzki was

permitted to and did remove belongings from her office and that

WCM prepared and shipped all of her broker-dealer files.  The

Plaintiffs contend that WCM refused to give Schatzki the

financial files and records for Schatzki's personal bank and

investment accounts and the books and records of her businesses,
thereby disrupting the Plaintiffs attempts to continue business
operations.  The Defendants dispute these facts.  The Plaintiffs
also contend that WCM stopped forwarding mail, including
insurance company notices, addressed to Schatzki, resulting in
cancellation of insurance policies, lapse of coverage and
permanent damage to Schatzki and her clients.  The Defendants
dispute this fact, stating that Kathleen Cheuk forwarded all of
Schatzki's mail for the first four months after she was
terminated and that after the first four months, Cheuk sent the
mail back to the insurance carrier and provided Schatzki's
address upon request.

        According to the Plaintiffs, as of May 2010 there were
approximately 80 entries on the SmartOffice database of clients
who were exclusively clients of WCM and not clients of BPP or
Schatzki.  The Defendants dispute this fact, stating that the
SmartOffice database contained contacts and prospects of others
at WCM.  After Schatzki's termination in May 2010, the
Plaintiffs instructed Ebix, Inc. to amend the SmartOffice
database so that personal financial information of financial
investment clients who were not clients of BPP or Schatzki would
be segregated from the SmartOffice database.  The Plaintiffs

9

then requested access to the remaining information.  WCM caused
Ebix, Inc. to change the password on the SmartOffice account
leased by BPP and change the title of the account to Weiser.
According to the Plaintiffs, by changing the passwords, WCM
locked Schatzki and BPP out of the database and cut them off
from their clients.  According to the Defendants, Schatzki was
able to obtain access to the SmartOffice system on May 19, 2010
and that Ebix, Inc. then terminated both WCM's and Schatzki's
access to SmartOffice.  Access subsequently was given to both
WCM and Schatzki as a result of a settlement reached during the
course of mediation in July 2010.

On May 10, 2010, WCM was instructed by Comprehensive
Asset Management Services, Inc., its broker dealer, to prevent
WCM employees from accessing the personal and private financial
information of Schatzki's financial planning clients as required
by Regulation S-P.  According to the Plaintiffs, instead of
complying with Regulation S-P, WCM immediately granted its
employees access to the financial and personal information of
Schatzki's clients, notwithstanding the fact that Weiser had no
investment advisor relationship to the clients and had no legal
basis for accessing their financial information.  WCM employees
then used this confidential information to contact those clients

10

and pressure them into changing their investment advisor from
Schatzki to WCM.  The Defendants deny this contention, stating
that the clients executed agreements with WCM.  Schatzki's
attorneys repeatedly demanded return of the files and database,
and WCM's counsel also demanded that Schatzki make SmartOffice
available to WCM.

        According to the Plaintiffs, after cutting off
Schatzki from the SmartOffice data and taking control of
Schatzki's clients' paper files, Michel and other employees of
WCM sent a misleading letter to Schatzki's clients stating that
Schatzki had left WCM and directing them to immediately sign an
agreement transferring their accounts to WCM or else they would
have no advisory representation.  According to the Defendants,
WCM never cut off the Plaintiffs, who regained access to
SmartOffice on May 19, 2010, and neither WCM nor the Plaintiffs
had access to the SmartOffice system from May 19, 2010 until
after the mediation in July 2010.  Michel and other WCM
employees discussed what to tell Schatzki's clients.  The
Plaintiffs state that, after discussing what to tell Schatzki's
clients, WCM employees contacted those clients using the
Plaintiffs' data and files and spread misinformation about
Schatzki, falsely informing Schatzki's clients that WCM had no

way to reach her.  According to the Defendants, the employees
read from a script prepared by legal counsel that did not
include any false or misleading statements, instead stating that
the client could express his or her preference between Schatzki
or WCM by signing one of two enclosed forms.

The Plaintiffs state that the uncertainty and
unsettled nature of the markets, combined with the pressure from
WCM, prompted some of Schatzki's clients to temporarily or
permanently sign agreements to move their investment accounts to
WCM.  Because WCM had cut off Schatzki's and BPP's access to
client files on SmartOffice and taken control of the paper
files, the Plaintiffs contend that Schatzki had no way to reach
her clients.  The Defendants dispute these facts, stating that
Ebix, Inc. denied SmartOffice access to both Schatzki and WCM,
and access was only restored after a settlement was reached
following mediation in July 2010.

According to the Plaintiffs, during the period the
Defendants had exclusive access to client information,
commissions and fees were paid to the Defendants that should
have been paid to Schatzki.  However, WCM has refused to pay
Schatzki the commissions and fees she earned in 2009 and 2010.

The Defendants contend that nothing is owed. According to the
Plaintiffs, it is common knowledge that an employee at
Schatzki's level is entitled to severance upon termination, but
the Defendants dispute this fact. The Plaintiffs state that
Schatzki's book of business was approximately $2.1 million as of
December 31, 2008 and that it is a rule of thumb in the
securities industry that the value of a financial advisor's
business is two-and-one-half or three times the amount of the
book of business, thereby establishing the value of the
Plaintiffs' business to be approximately $5 million as of May 3,
2010. The Defendants object to the Plaintiffs' calculation on
grounds that no expert witness has been identified and that
these assertions are opinions as to how to value a financial
advisor's business.

**The Summary Judgment Standard**

Summary judgment should be rendered if the pleadings,
the discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law. Fed. R. Civ. P. 56(c). The courts do not try
issues of fact on a motion for summary judgment, but, rather,

13

determine "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct.
2505, 91 L.Ed.2d 202 (1986).

        "The party seeking summary judgment bears the burden
of establishing that no genuine issue of material fact exists
and that the undisputed facts establish [its] right to judgment
as a matter of law."  Rodriguez v. City of N.Y., 72 F.3d 1051,
1060-61 (2d Cir. 1995).  Summary judgment is appropriate where
the moving party has shown that "little or no evidence may be
found in support of the nonmoving party's case.  When no
rational jury could find in favor of the nonmoving party because
the evidence to support its case is so slight, there is no
genuine issue of material fact and a grant of summary judgment
is proper."  Gallo v. Prudential Residential Servs., L.P., 22
F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).  In
considering a summary judgment motion, the Court must "view the
evidence in the light most favorable to the non-moving party and
draw all reasonable inference in its favor, and may grant
summary judgment only when no reasonable trier of fact could
find in favor of the nonmoving party."  Allen v. Coughlin, 64

F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of events is not wholly fanciful."  Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (internal quotation marks omitted).

When deciding a motion for summary judgment, a court must remain mindful of the fact that summary judgment is "an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury."  H & M Hennes & Mauritz LP v. Skanska USA Bldg., Inc., 617 F. Supp. 2d 152, 155 (E.D.N.Y. 2008).

**With Respect To The Conversion Claim, Both The Plaintiffs'
Motion For Partial Summary Judgment And The Defendants' Motion
For Partial Summary Judgment Is Denied**

Count II of the SAC alleges conversion against all Defendants.  The Plaintiffs allege that their files contained confidential and proprietary information that Schatzki and BPP assembled, including their clients' personal contact

15

information, and that the Defendants, after terminating

Schatzki, took over control and misappropriated these files for

the purpose of stealing the Plaintiffs' clients.  "To withstand

a motion to dismiss a conversion claim, a plaintiff must allege

(1) title to the property converted, or his right to possession

of that property; (2) an act of conversion by the defendant; and

(3) damages caused by the conversion."  Simon v. Weaver, 327 F.

Supp. 2d 258, 262 (S.D.N.Y. 2004) (internal quotation marks and

citation omitted); see also Jaffe v. Capital One Bank, No. 09

Civ. 4106(PGG), 2010 WL 691639, at *7 (S.D.N.Y. Mar. 1, 2010).

Because the evidentiary record presents genuine issues of

material fact concerning these three elements, both the

Plaintiffs' and Defendants' motions for summary judgment

concerning the conversion claim are denied.


There are genuine issues of material fact concerning

whether the Plaintiffs' held a possessory right in the

SmartOffice database and whether the Defendants committed an act

of conversion.  According to the Plaintiffs, Schatzki and BPP

had a possessory right in the SmartOffice data because they were

parties to a User Agreement with Ebix, Inc., the company that

licensed the software.  The Plaintiffs contend that,

notwithstanding this possessory right, WCM exercised exclusive

dominion over the SmartOffice database in violation of the
Plaintiffs' rights by changing the SmartOffice password and
refusing to divulge it to Schatzki.

        The Defendants do not dispute that the Plaintiffs held
a possessory interest in the information, but they contend that
the Defendants also had a possessory interest in the SmartOffice
data because the Plaintiffs permitted the Defendants to use the
database, and WCM paid the licensing fee for the software.  This
Court has previously held that "[w]here the original possession
is lawful, a conversion does not occur until the defendant
refuses to return the property after demand or until he sooner
disposes of the property."  Seanto Exports v. United Arab
Agencies, 137 F. Supp. 2d 445, 451 (S.D.N.Y. 2001).  According
to the Defendants, because the SmartOffice database was shared
with WCM employees, the Plaintiffs must prove that they made an
adequate demand that the Defendants return the property.  The
Defendants contend that insufficient evidence of this demand has
been presented.  Additionally, the Defendants state that at the
time Schatzki's employment was terminated, it was Ebix, Inc.,
rather than the Defendants, who were in possession of the
SmartOffice database and that it was Ebix, Inc. that
unilaterally terminated the access, with the Defendants taking

17

no part in preventing the Plaintiffs from accessing the
information. Without sufficient evidence in the record to
resolve these issues of material fact, summary judgment cannot
be granted.

Similarly, the evidentiary record raises genuine
issues of material fact concerning Schatzki's damages. Under
New York law, "[d]amages for conversion are usually the value of
the property at the time of conversion. However, lost profits
are allowed 'where either from the nature of the article or
peculiar circumstances of the case they might reasonably be
supposed to follow from the conversion.'" Sindhwani v. Coe Bus.
Serv. Inc., 52 A.D.3d 674, 676, 861 N.Y.S.2d 705, 708 (2d Dep't
2008); see also Fantis Foods, Inc. v. Standard Importing Co.,
Inc., 49 N.Y.2d 317, 326, 402 N.E.2d 122, 125 (1980). Here,
because of the difficulty of ascertaining a value of the
Plaintiffs' client database at the time of conversion, the lost
profits approach represents the appropriate method for
determining damages.

To prove the existence of damages, the Plaintiffs
contend that the affidavits they have submitted establish that
the Defendants utilized Schatzki's files in an effort to steal

18

her clients.  Additionally, both Schatzki and her brother Brian
Edelman, who serves as an officer, director and shareholder of
BPP, have submitted affidavits stating that the value of BPP's
book of business, which manifests itself in the files and
information allegedly taken from the Plaintiffs, exceeds $5
million under industry standards.  Edelman, whose
responsibilities at BPP include managing the SmartOffice
database, has stated that creating BPP's database would cost in
excess of $5 million.  Accordingly, the Plaintiffs state that
the converted assets valued at, at least, $5 million, but that
the ultimate award of lost profits and punitive damages are
questions for the jury.  No other evidence is offered concerning
the Plaintiffs' damages.

The Defendants contend that the Plaintiffs have failed
to present any proof of damages, noting that the Plaintiffs
regained access to the SmartOffice database system on May 19,
2010, sixteen days after Schatzki's termination.  The Defendants
also note that the $5 million figure does not represent an
approximate measure of damages, as there is no evidence that the
Plaintiffs lost the entirety of their business, or that the
Plaintiffs were required to recreate the database.  Furthermore,
the Defendants contend that the Plaintiffs cannot identify any

clients that Schatzki lost as a result of WCM's alleged
conversion of the SmartOffice database.

The evidence the parties have presented concerning the
issue of damages is scant.  In addition to the affidavits from
Schatzki and Edelman, the Plaintiffs have provided affidavits
from two of Schatzki's clients, Ms. Lorraine McGrath and Ms.
Michelle DeFelice.  Although each of these clients describes how
WCM, after misleading these clients regarding Schatzki's
whereabouts, obtained control of these clients' accounts, both
affidavits also describe how these clients promptly returned
their accounts to Schatzki's care after Schatzki reached out to
them.  See McGrath Aff. at 2; DeFelice Aff. ¶ 11.  The parties
have not established whether Schatzki suffered damages during
the time she was unable to contact her clients, nor has it been
proven how many clients, if any, Schatzki lost as a result of
the Defendants' alleged conduct.  This uncertainty concerning
the Plaintiffs' damages, along with the disputed facts
concerning the Defendants' alleged acts of conversion, renders
granting a summary judgment motion on the conversion claim
inappropriate. Accordingly, both the Plaintiffs' and Defendants'
motions for summary judgment concerning Count II are denied.

20

**With Respect To The Civil Conspiracy Claim, The Defendants'
Motion For Summary Judgment Is Denied**


         Count V of the SAC alleges civil conspiracy against

all Defendants.  New York law recognizes a cause of action for

civil conspiracy where that cause of action is linked to other

alleged torts.  World Wrestling Federation Entm't v. Bozell, 142

F. Supp. 2d 514, 532 (S.D.N.Y. 2001).  To prevail on a claim of

civil conspiracy, as an initial threshold, a plaintiff must

demonstrate a primary underlying tort from which the conspiracy

claim derives.  See Sepenuk v. Marshall, No. 98 Civ. 1569(RCC),

2000 WL 1808977, at *6 (S.D.N.Y. Dec. 8, 2000).  Without an

independent tort, there can be no claim for civil conspiracy.

See Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir.

2006); Alexander & Alexander of New York, Inc. v. Fritzen, 68

N.Y.2d 968, 969, 503 N.E.2d 102, 102, 510 N.Y.S.2d 546, 547

(1986).  In addition to the primary tort, a plaintiff must prove

the four essential elements of a conspiracy claim: (1) an

agreement between two or more parties; (2) an overt act in

furtherance of the agreement; (3) the parties' intentional

participation in the furtherance of a plan or purpose; and (4)

resulting damage or injury.  World Wrestling Federation, 142 F.

Supp. 2d at 532.

21

The Defendants contend that they are entitled to summary judgment on the civil conspiracy claim for two reasons. First, because the only tort claim the Plaintiffs have alleged is conversion, the civil conspiracy claim should be dismissed because the Plaintiffs' conversion claim fails as a matter of law. Because the Defendants' summary judgment motion concerning the conversion claim has been denied, this reasoning fails.

The Defendants' second argument is that, under conspiracy law, a corporation cannot conspire with its agents or employees acting within the scope of employment. See Tufano v. One Toms Point Lane Corp., 64 F. Supp. 2d 119, 133 (E.D.N.Y. 1999) ("It is basic conspiracy law that a corporation cannot conspire with its agents or employees acting within the scope of their employment – or, more precisely, that since a corporation can only act through its agents, a claim that the agents collectively agreed to take some unlawful action in the name and on behalf of the corporation is simply another way of saying that the corporation acted unlawfully and therefore does not satisfy the basic requirements of a conspiracy."). The Defendants contend that because Michel is an employee of WCM and that Weiser is WCM's parent company, a civil conspiracy claim cannot lie. However, because the SAC does not specify a time

22

period concerning the existence of the alleged conspiracy and
because Michel was formerly an employee of BPP, there is a
genuine issue of material fact concerning whether the alleged
conspiracy to convert the Plaintiffs' property occurred during a
time when Michel was not employed at WCM.  Accordingly, the
Defendants' motion for summary judgment concerning the civil
conspiracy claim is denied.


**The Defendants' Motion For Partial Summary Judgment With Respect
To The Plaintiffs' Claims For Severance Pay Is Granted**


          The Defendants have moved for summary judgment to
dismiss the Plaintiffs' claim that Schatzki is entitled to
receive "severance normally granted to a principal of the firm
upon termination without cause."  SAC ¶¶ 89-90.  The Plaintiffs
contend that Schatzki's severance claim raises questions of fact
and should be submitted to the jury because New York law
recognizes that "[i]f the defendant engaged in a practice of
making severance payments to nonunion employees on the
termination of employment, and if such employees relied on this
practice in accepting or continuing their employment, plaintiffs
have a cause of action against the defendant."  Morschauser v.
Am. News Co., 6 A.D.2d 1028, 1028, 178 N.Y.S.2d 279, 279 (1st
Dep't 1958); Doyle v. Turner, No. 86 CIV. 2792 (CSH), 1994 WL

524996, at *2 (S.D.N.Y. Sept. 26, 1994); Hirschfeld v.

Institutional Investor, Inc., 260 A.D.2d 171, 172, 688 N.Y.S.2d

31, 31 (1st Dep't 1999).  In her affidavit, Schatzki states that

she was told that another employee received severance upon being

terminated.  Schatzki Aff. ¶ 101.  Schatzki's affidavit also

states: "I was also told that severance was customary at Weiser,

and shortly thereafter I felt confident enough in the good faith

of Weiser that I discontinued my affiliation with M&K.  One

reason for this was that I relied upon the severance practices I

was told existed at WCM.  It was common knowledge that WCM that

personnel at the level of [another employee] or myself who were

terminated received large severance settlements."  Id.  An email

to Schatzki from Weiser's general counsel dated May 3, 2010

refers to Schatzki receiving one month's pay as severance if she

resigned or two-weeks' pay as severance if she did not.  See

Pls.' Ex. I.


     Because Schatzki did not have a formal, written

employment agreement, Schatzki's claim for severance can only

survive if the evidence shows (1) that the Defendants engaged in

a practice of making severance payments to nonunion employees on

the termination of employment, and (2) that Schatzki relied upon

this practice in accepting her employment with the Defendants.

24

See <u>Smith v. N.Y. State Elec. & Gas Corp.</u>, 155 A.D.2d 850, 850,

548 N.Y.S.2d 117, 117 (3d Dep't 1989).  Here, the only evidence

the Plaintiff offers in support of her demand for severance pay

is her own affidavit.  However, this affidavit contradicts

Schatzki's deposition testimony, in which she stated that she

did not remember any promise of severance if she were fired.  At

her deposition, Schatzki testified as follows:


> **Q.**  When you were hired in October 2007, were you promised
> compensation or severance if you were to be fired?
> **A.**  The promise was that if we left, just like we left with
> Marcum & Kliegman, that we would be able to take our files,
> our records and our clients with us.
> **Q.**  I asked you a specific question about - -
> **A.**  But that was the compensation that we had because it
> was - - we brought a lot of business with us.
> **Q.**  Let me ask you the question again.
> **A.**  Okay.
> **Q.**  Please try to answer the question I am asking.
> **A.**  Right.
> **Q.**  Right.  When you were hired by Weiser Capital
> Management - -
> **A.**  Right.
> **Q.**  - - were you promised if you were terminated - -
> **A.**  Right.
> **Q.**  - - you would receive severance?
> **A.**  I don't remember.


Schatzki Dep. at 250:18-251:17.  Schatzki's deposition was taken

on June 14, 2011, and her affidavit is dated September 8, 2011.

"[A] party may not create an issue of fact by submitting an

affidavit in opposition to a summary judgment motion that, by

25

omission or addition, contradicts the affiant's previous
deposition testimony." Hayes v. N.Y. City Dep't of Corr., 84
F.3d 614, 619 (2d Cir. 1996); see also Raskin v. Wyatt Co., 125
F.3d 55, 63 (2d Cir. 1997) ("To the extent that [the witness']
earlier deposition testimony is at odds with his declaration, we
follow the rule that a party may not create an issue of fact by
submitting an affidavit in opposition to a summary judgment
motion that, by omission or addition, contradicts the affiant's
previous deposition testimony.").


        With respect to the May 3, 2010 email from Weiser's
general counsel to Schatzki mentioning severance in the amount
of one month's pay if Schatzi were to resign and two weeks' pay
if Schatzki did not, there is no evidence suggesting that this
two-week severance is anything more than a gratuitous promise,
unenforceable as a matter of law.  See Presbyterian Church of
Albany v. Cooper, 112 N.Y. 517, 520-21 (1889) ("It is, of
course, unquestionable that no action can be maintained to
enforce a gratuitous promise, however worthy the object intended
to be promoted.  The performance of such a promise rests wholly
on the will of the person making it.  He can refuse to perform,
and his legal right to do so cannot be disputed . . .").
Without valuable consideration and mutuality, a contract cannot

26

be enforced under New York law. See <u>Strobe v. Netherland Co.</u>, 245 A.D. 573, 578-79, 283 N.Y.S. 246, 246 (4th Dep't 1935) ("It is a well-settled rule of equity, however, that an agreement will not be enforced unless it is founded upon a valuable consideration, and is mutual in its obligation and in its remedy."). Because the two-week severance referenced in the May 3, 2010 email lacks consideration, it lacks mutuality and is merely a gratuitous promise, not actionable under New York law. Accordingly, the Defendants' motion for summary judgment with respect to the Plaintiffs' claims concerning severance is granted.

**The Defendants' Motion For Partial Summary Judgment With Respect To The Plaintiffs' Claims For Future Renewal Insurance Commissions Is Moot**

Finally, the Defendants have moved for summary judgment to dismiss the Plaintiffs' claim that Schatzki is entitled to receive future renewal insurance commissions. SAC ¶¶ 88, 90. In the insurance industry, commissions are earned upon sale of a policy, although there is often a lag between the time of sale and the time at which the insurance company collects the commission. Usually, a large portion of the commission due on sale of a policy is paid immediately, and a

27

smaller portion paid is paid annually over a number of years, so long as the policy remains in effect.  The Plaintiffs identify these payments as "trail" or "residual" commissions.  When an insurance client signs a new insurance policy upon expiration of an old term policy, this policy is called a renewal policy, and the seller of the policy receives a "renewal" commission.  In Count IV of the SAC, the Plaintiffs allege that "WCM also agreed to pay renewal commissions to Schatzki, on insurance sales that she brokered while at WCM, and is continuing to pay them to other employees.  Schatzki is entitled to receive her renewal commissions regardless of whether she is still employed by WCM." SAC ¶ 88.[1]  However, in their summary judgment briefing, the Plaintiffs have stated that "to the extent that any client signed a renewal policy after Schatzki was terminated, Schatzki is making no claim to a commission generated on that new policy."  Pls.' Opp. Br. at 23.  Because the Plaintiffs have dropped their claim for "future renewal commissions," the Defendants' summary judgment motion on this point is moot.  The Plaintiffs may not seek to hold the Defendants liable for

---

[1]     In addition, the SAC states: "Therefore, Plaintiff Schatzki has been damaged in an amount to be determined at trial for the earned commissions withheld by WCM, the future renewal commissions and to the severance normally granted to a principal of the firm upon termination without cause."  SAC ¶ 90 (emphasis added).

28

"future renewal commissions." Because the parties have not raised the issue of trail commissions or renewal commissions earned during Schatzki's employment at WCM, any issues concerning these commissions is not addressed in this opinion.

**Conclusion**

Based on the conclusions set forth above, the Defendants' motion for partial summary judgment is granted in part, and the Plaintiffs' motion for partial summary judgment is denied.

It is so ordered.

New York, NY
January /8, 2012

_____
ROBERT W. SWEET
U.S.D.J.

29