UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

DEBRA SCHATZKI and BPP WEALTH, INC.,

                          Plaintiffs,                    10 Civ. 4685

     -against-                                           OPINION

WEISER CAPITAL MANAGEMENT, LLC,
WEISERMAZARS, LLP and HOITSZ (A/K/A
"CARIJN") MICHEL,

                          Defendants.

------------------------------------------X

A P P E A R A N C E S:

          Attorneys for Plaintiff

          LAWLER MAHON & ROONEY LLP
          36 West 44th Street, Suite 1400
          New York, NY 10036
          By:  Albert K. Lawler, Esq.
               Christopher S. Rooney, Esq.
               James J. Mahon, Esq.

          Attorneys for Defendants

          STARK & STARK, P.C.
          993 Lenox Drive
          Lawrenceville, NJ 08543
          By:  Scott I. Unger, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-26-13

**Sweet, D.J.**


Defendants Weiser Capital Management, LLC ("WCM"), WeiserMazars, LLP ("Weiser") and Hoitsz Michel ("Carijn" or "Michel") (collectively, the "Defendants") have moved pursuant to Rule 56 of the Fed. R. Civ. P. for partial summary judgment and dismissal of Counts II (Conversion), III (Breach of Contract), V (Civil Conspiracy) and VI (Unjust Enrichment) of the Third Amended Complaint ("TAC") of Plaintiffs Debra Schatzki ("Schatzki") and BPP Wealth, Inc. ("BPP") (collectively, the "Plaintiffs") and under Fed. R. Civ. P. 19 to dismiss the TAC for failure to join an indispensable party. The Plaintiffs have cross-moved under the same rule for partial summary judgment on Counts II (Conversion) and VI (Unjust Enrichment). Based upon the facts and conclusions set forth below, the motions with respect to Counts II (Conversion) and VI (Unjust Enrichment) of the TAC are denied, and the Defendants' motion with respect to Count V (Civil Conspiracy) is denied. The Defendants' motion for summary judgment and dismissal of Count III (Breach of Contract) is granted, and the Defendants' motion to dismiss the TAC for failure to join an indispensable party is denied.


1

This heavily litigated action has resulted in extensive motion practice, mediation and the instant motions. It is hoped that the disposition of these motions and the pending in limine motions will lead to a resolution by settlement or trial in the near future.

**Prior Proceedings**

This action was initiated by the Plaintiffs on June 16, 2010 arising out of the termination of the relationship between the parties and a dispute over the use of the internet-based management program, SmartOffice.

A motion for a temporary restraining order and a preliminary injunction was resolved after conference with the magistrate. A motion to dismiss the First Amended Complaint was denied on January 26, 2011. A Second Amended Complaint was filed on August 4, 2011. A motion by the Defendants for partial summary judgment and a cross-motion by Plaintiffs were determined by opinion on January 19, 2012 (the "January 2012 Opinion"). A motion to amend by the Plaintiffs was granted in part and denied in part by opinion on June 30, 2012 (the "June 2012 Opinion"). The TAC was filed on July 23, 2012.

2

The magistrate on May 8, 2013 considered discovery complete except for one short deposition. In limine motions have been filed and the instant motions and cross-motion were heard and marked fully submitted on September 25, 2013.

**The Facts**

The facts have been set forth in the Defendants' Rule 56.1 Statement, the Plaintiffs' Objection to Defendants' Rule 56.1 Statement, the Plaintiffs' Rule 56.1 Statement and the Defendants' Responses and Objection to the Plaintiffs' Rule 56.1 Statement. The facts described below are undisputed except as noted.

Schatzki is a financial planning professional who has worked in the financial services industry for more than 30 years. She is a certified financial planner, independent financial advisor, chartered life underwriter and accredited estate planner who also holds Series 6, 63 and 65 and life and health insurance licenses.

3

Over the course of Schatzki's career, she has developed a portfolio of clients and prospective clients comprised principally of high net worth individuals, along with several businesses. She has provided financial planning services to these clients, including life, health and long term care insurance, financial and estate planning and investment advisory services.

Schatzki started working for Marcum & Kliegman, LLP ("M&K") in 2000. She ran M&K's investment advisory and financial services division until September 2007.

In 2002, Schatzki formed BPP which holds an insurance brokerage license and provides insurance and financial planning services for wealthy individuals and consulting services for accounting firms. Schatzki was a seventy percent (70%) owner of BPP. Defendant Michel was a twenty percent (20%) owner of BPP and on May 3, 2010, she was an officer of BPP. Brian Edelman ("Edelman") was a ten percent (10%) owner of BPP. BPP developed systems to provide structure and processes for wealth management businesses in accounting firms. Prior to October 2007, Schatzki and BPP used this system with the accounting firm of M&K. BPP remained an independent entity while Schatzki served as managing

4

director of M&K's financial services subsidiaries, M&K Financial Services LLC and M&K Investment Advisory LLC (collectively, the "M&K Wealth Management Subsidiaries").

Weiser is an international accounting firm, and from 2007 to 2010, Weiser was Schatzki's personal and business accountant. WCM is a wholly-owned subsidiary of Weiser, and provides financial and wealth management services.

In September 2007, Schatzki and BPP reached an agreement with Weiser and WCM to bring Schatzki's team of advisors and office staff, including Michel, from M&K to WCM. Schatzki and her team were at-will employees. Details of the agreement and its form are disputed. The terms on which the BPP service marks and processes were used by WCM are in dispute.

While at WCM, Schatzki and BPP continued to serve their own financial services clients and collected "trail commissions" for policies sold before joining WCM. Schatzki and BPP served M&K financial services clients and Weiser financial services clients. Schatzki did not sell her book of business to WCM, nor did BPP sell its service marks or processes to WCM.

5

The parties split the commissions and fees earned by Schatzki, with 75% kept by WCM when it was the source of the client and 65% kept by WCM when Schatzki was the source. The commissions and fees were paid directly to WCM, which channeled Schatzki's share to her. All of the licensed sales people had the same salary plus commission arrangement, and all of them split commissions on the same percentages.

During her first year of employment with WCM, Schatzki's compensation was an annual base salary of $150,000 plus the split of commissions and fees with an advance of $100,000 against those commissions. In 2008, Schatzki earned commissions and fees that exceeded her advance, and WCM paid her the balance of the earned commissions and fees.

Following the termination of its former CEO, Jordan Berlin ("Berlin"), Schatzki's compensation in 2009 increased to $400,000. According to Schatzki, following Berlin's termination, in addition to her own initial duties and responsibilities, Schatzki was directed to assume many of Berlin's duties and responsibilities. According to Defendants, those duties were assigned to Michel. According to Schatzki, she continued to earn incentives that included commissions on her insurance sales and

6

fees for assets under management. Defendants deny that she continued to earn commissions.

SmartOffice is a client management program that was licensed to BPP by EBIX, Inc. ("EBIX"). According to Plaintiffs, SmartOffice stores valuable electronic data pertaining to clients' insurance policies, investments, dates of birth, family members and notes of interactions and conversations with clients. Such data helps financial planners identify planning and sales opportunities.

Schatzki began using SmartOffice more than 20 years ago to store all contact information for clients, prospects or contacts. This included personal contact information for all her clients, such as cell phone numbers, email addresses and social security numbers, as well as notes of conversations, copies of their insurance policies and records of other financial products that they purchased. When Schatzki joined M&K, she brought the SmartOffice license to M&K. According to the Defendants, M&K reimbursed Schatzki or BPP for the SmartOffice licensing fees while Schatzki was an M&K employee. BPP licensed SmartOffice from EBIX, pursuant to a written user agreement. BPP was the sole licensee of SmartOffice. WCM was not a licensee as of May

7

3, 2010, the date that Weiser terminated its agreement with Plaintiffs.

All of the data in SmartOffice as of October 1, 2007 was the property of Schatzki and BPP. As of the date of this action, there were approximately twelve thousand three hundred (12,300) entries in SmartOffice, including clients, contacts and prospects. Certain of those clients required the services of a registered investment advisor, and some required the services of a broker-dealer.

Schatzki instructed M&K, and later, WCM employees to enter their clients' data on the SmartOffice database. Prior to October 2007, Schatzki and BPP provided access to that database to Schatzki's team of financial service providers, who at that time were employees of the M&K Financial Services Subsidiaries. The database was available to those employees who were working with Schatzki at the M&K Financial Services Subsidiaries.

Schatzki had a series of meetings with WCM in the summer of 2007 during the course of which she discussed the possibility of her and "her team" joining WCM. Schatzki's "team" consisted of Michel, David Weinstock I ("Weinstock"), Wendy

8

Siegal ("Siegal"), Jill Maerkle ("Maerkle") and Al Rivers ("Rivers") and, according to Plaintiffs, Paul Lentini ("Lentini"). They were trained by Schatzki and utilized BPP systems. Siegal, Maerkle, Weinstock and Rivers were not employees of BPP.

Schatzki joined WCM on October 1, 2007, according to Plaintiffs, on a non-exclusive basis. Schatzki did not have a formal, written employment contract with WCM; she was employed at will. According to Plaintiffs, the law firms of Bryan & Cave and Stark & Stark prepared an agreement detailing Plaintiffs' commissions and specifying a 10% override for WCM's license of BPP's systems and intellectual property. The parties have produced no signed agreements, and Schatzki has no memory of signing a final version.

Michel became employed by WCM on or about September 27, 2007. Siegal, Maerkle, Rivers and Weinstock also became employees of WCM in or around September 2007. According to the Plaintiffs, Siegal became an employee pursuant to the agreement Plaintiffs reached with WCM, received training from Schatzki on BPP's processes for implementing successful wealth management divisions in accounting firms and utilized BPP's property,

9

including SmartOffice, to her benefit. Siegel had her own clients and used SmartOffice; according to Plaintiff, this use was under Schatzki's supervision.

Rivers and Weinstock became employees pursuant to an agreement that Plaintiffs reached with WCM. Schatzki, not Weinstock, negotiated Weinstock's employment terms. Weinstock had his own clients prior to joining WCM. According to Plaintiffs, most of his clients were developed by Schatzki.

Not all of Schatzki's clients decided to follow her from M&K to WCM. Schatzki had no agreements with the clients; the clients were free to choose between her or WCM or take their business elsewhere. According to the Plaintiffs, Schatzki, as a financial planner, had individual relationships with her clients. The standard agreements between clients and financial planners allow clients to change their affiliation at any time. Schatzki understood that the client could always choose their adviser.

Schatzki's team had access to SmartOffice, and provided SmartOffice access to additional WCM employees who needed the access to serve clients that used BPP's systems and

10

processes. The Defendants deny that BPP had systems and processes. SmartOffice remained password protected, and, after the move, it was no longer accessible to an employee of M&K.

According to Plaintiffs, SmartOffice was not made available generally to WCM partners or employees. According to Defendants, it was available to all WCM employees.

When Schatzki and her team moved to WCM, they also brought with them all of the paper files on Plaintiffs' clients, prospects and contacts. Electronic data on those clients that was not on SmartOffice was stored on the "F" drive of WCM's server.

During Schatzki's affiliation with WCM, additional data was added to the SmartOffice database: some for clients of Schatzki; some for clients of WCM or its employees; and some for clients dealing with both entities. The terms and form of the affiliation is disputed. Defendants deny BPP had clients of its own because BPP collected trail commissions for policies that were sold by Schatzki before her affiliation with WCM.

11

According to Plaintiffs, Michel was the administrator for the SmartOffice system, under Schatzki's supervision and control.

At no time did Schatzki or BPP transfer the SmartOffice license to any of the Defendants, and none of the Defendants were ever authorized to substitute themselves or third parties as the licensee in place of BPP. Defendants deny this statement stating that WCM paid the licensing fees by reimbursing Plaintiffs for the monthly SmartOffice licensing fee.

On May 3, 2010, WCM terminated its relationship with Plaintiffs. WCM did not terminate Michel, who is now WCM's Compliance Officer. After Plaintiffs' termination, Michel had a discussion with a Weiser employee about Schatzki's access to SmartOffice. After this discussion, Michel instructed EBIX to change the password on BPP's SmartOffice account and changed the title of the account to "Weiser."

By changing the passwords and title, WCM locked BPP and Schatzki out of the database and cut them off from their clients' data, while giving WCM employees access to private

12

information of Schatzki clients with whom WCM had no prior relationship. The Defendants deny that WCM "cut off" Plaintiffs. They note that BPP was not "lock[ed] out" because Michel still had access to SmartOffice and was a twenty-percent owner of BPP. Defendants further point out that Schatzki was able to access SmartOffice on May 19, 2010. After changing the password, Michel let WCM employees, who contacted Schatzki clients, use the new login information.

Michel had been BPP's designated "primary contact" and as such had EBIX change the login information. Michel admitted that she was acting as a WCM employee when she changed the password at her deposition, stating: ". . . I acted as a compliance director for Weiser Capital Management." Transcript of Deposition of Defendant Carijn Michel dated June 16, 2011 (hereinafter "Michel Dep.") at 170:16-20.

Plaintiffs demanded that Defendants restore access to SmartOffice and Plaintiffs' data to Plaintiffs and asserted that they owned the entire SmartOffice database. According to the Defendants, Plaintiffs sought all the data including WCM data.

13

In a May 9, 2010 email from Robert C. Nagle ("Nagle"), Schatzki's attorney, to Tom Giachetti ("Giachetti"), WCM's attorney, Nagle wrote: "To facilitate providing Debra with immediate access to client-related information, we need a copy of Debra's "F" drive from Weiser's server (this can be copied onto USB drive [sic]) and a duplicate of the SmartOffice database maintained by EBIX."

In a May 9, 2010 email from Nagle to Giachetti, Nagle wrote: "Separately, Debra's former assistant Carijn acted improperly when she designated herself as the "Registered User' [sic] for the SmartOffice application without Debra's permission, then terminated Debra's access to it upon her termination. I request that your client instruct Carijn to restore Debra as the Registered User at once (Monday 5/11)."

In a May 9, 2010 email from Nagel to Giachetti, Nagle wrote: "SmartOffice [sic] database belongs to Debra [Schatzki]. Please confirm that this will be provided tomorrow - per below, this can be effectuated with simple email."

In a May 10, 2010 email from Nagel to Giachetti, Nagle wrote: "I understand you will speak to [WCM] business people re:

14

suspending phone calls to clients re: Debra's separation, which
I appreciate." Defendant contends that the email was directed to
Scott Univer ("Univer"), General Counsel for WCM, who was copied
on the email.

In a May 10, 2010 email from Univer to Nagle, Univer
wrote: "The phone script that was used (that I read to you) is
attached. I understand that substantially all the calls have
been made. As I indicated, we will try to get you the first cut
on the disaggregated SmartOffice data base and Debra's 'F Drive'
files tomorrow, but that may be a little longer." In a May 10,
2010 email from Nagle to Giachetti, Nagle responded to Univer's
email: "I am concerned about the delay in producing the client
information I requested. Easy Data could have provided a copy of
the SmartOffice database with the click of a button if they had
been asked. I recognize that Weiser has decided to 'scrub'
certain files from the database and that ultimately Debra will
receive more info than just the protocol information, but she
still does not have access to her clients while Weiser has been
busy calling the whole list. If the protocol-related information
is available in any format, I request that it be provided
electronically or made available for retrieval or pickup
tomorrow AM. Debra needs this to communicate with her clients.

15

To be clear, this request is in addition to, not in lieu of, data production efforts addressed in Scott's email below."

On May 11, Giachetti wrote to Nagle: "Weiser will get a copy of the SmartOffice database by tomorrow. It will take a whole day to go through it and delete the non-Debra entries. So we are talking about Friday, probably."

On May 11, Nagle wrote to Giachetti: "I renew my request to for [sic] Weiser to provide a copy of the full SmartOffice database and F drive."

On May 13, 2010, Giachetti wrote to Nagle: "good [sic] morning. Weiser is getting the SmartOffice data base [sic] copied but having problems with vendor. Not Weiser's fault. This is being expedited as best as Weiser can."

Plaintiffs did not receive a copy of SmartOffice or the "F" drive on Friday, May 14, 2010.

On May 14, 2010, Justin B. Ettelson ("Ettelson"), Schatzki's attorney, emailed Giachetti: "Carijn acted improperly and without authorization when she designated herself as

16

registered user [sic] on the SmartOffice account and when she subsequently disabled Debra's access to the account . . . Weiser's actions to prevent our client's access to this data is unlawful conversion." Ettelson proposed a technical "script" to effectuate an appropriate "partitioning" of the SmartOffice data. Pursuant to the proposed "script", contacts added since Plaintiffs' May 3, 2010 departure, Weiser registered investment advisory ("RIA") clients and WCM clients who had no relationship with Schatzki would be deleted from Schatzki's copy of SmartOffice. Furthermore, all contacts and insurance/annuity policies created prior to Schatzki's date of hire at WCM, with the exception of David Weinstock's clients, would be removed from WCM's copy of Smart Office. According to the Defendants, it is not clear whether EBIX or Ettelson proposed the "script."

On Sunday, May 16, 2010, Giachetti wrote to Nagle: "Bob, if you can confirm that the below [description of what was on SmartOffice] is accurate, I will speak to Scott to address immediately authorizing the Release per Justin's proposed fix on Friday PROVIDED that simultaneous access is made for Weiser and that subsequent to the fix and Debra's access Weiser shall continue to have unfettered access thereto." According to the

17

Defendants, Giachetti was referring to assertions made by Edelman.

On May 17, 2010, Nagle responded to Giachetti: "Debra confirms accuracy of Brian's description of what is on SmartOffice database and information provided and is amenable to proceeding as per below. Scott, we just need OK from this AM, [sic] and Brian will interface with vendor to effectuate today."

On May 17, 2010, Nagle emailed Giachetti and Univer a list of Schatzki's RIA clients, and wrote: "The contacts on the attached .pdf are the Weiser RIA clients referenced below . . . and Debra is amenable to having them removed from her copy of the database . . . ." Defendants contend that the RIA clients had agreements with WCM.

Despite its initial interest in partitioning the database, WCM ultimately refused to partake in the proposed fix. According to the Defendants, the refusal resulted from the chronological separation and because the RIA clients had signed agreements with WCM.

18

WCM also refused to deliver the paper files on Schatzki's clients to her or give her a copy of the information on her clients that was stored on the "F" drive. According to Defendants, the refusal was limited to files that required written authorization from clients.

Plaintiffs did not have any access to SmartOffice or any other data on their clients from May 3, 2010 to May 18, 2010. Without access to SmartOffice, the "F" drive and her paper files, Plaintiffs had no way to contact or provide services to clients. According to Defendants, Schatzki received a list of her clients' contact information from WCM when she came into WCM's office to pick up her boxes.

Meanwhile, according to Plaintiffs, Defendants were using the database to contact Plaintiffs' clients and urge them to leave Schatzki and retain WCM as their financial advisor. This assertion is denied by Defendants.

On May 19, 2010, EBIX granted Plaintiffs limited access to SmartOffice. Plaintiffs contend that Schatzki was limited to viewing her clients' contact information only and was denied access to other client information that she needed to

19

adequately provide services to her clients. Defendants deny that Schatzki did not have sufficient information to contact her clients.

According to Plaintiffs, this limited access was cut off on May 29, 2010 when Defendants threatened EBIX with litigation, and Schatzki did not regain full access to SmartOffice until mid-July of 2010. This assertion is denied by Defendants.

Plaintiffs contend that immediately after Weiser terminated the agreement between WCM and BPP/Schatzki on May 3, 2010, Plaintiffs took steps to comply with federal and state privacy laws. This assertion is denied by Defendants. Specifically, Plaintiffs contend that after WCM's termination of Plaintiffs, Edelman instructed EBIX to segregate the data relating to WCM-only clients from the remainder of the database to prevent inadvertent access by Plaintiffs to the private information on those clients.

On May 10, 2010, Timothy L. Smith ("Smith") of Comprehensive Asset Management Services, Inc., WCM's broker-dealer, instructed WCM in writing that WCM was required to

comply with Regulation S-P by preventing WCM employees from accessing the personal and financial information of Schatzki-only broker-dealer clients.

According to the Plaintiffs, during her deposition, Michel stated that instead of complying with that instruction, WCM granted its employees access to all the financial and personal information of everyone of Schatzki's and BPP's clients. This assertion is denied by Defendants.

WCM had no independent relationship with Schatzki-only clients, apart from 38 Registered Investment Adviser ("RIA") clients. Defendants deny this assertion and claim that the clients executed agreements with WCM.

After WCM refused to partition the SmartOffice database, Plaintiffs commenced an action in state court and moved for an injunction that would restore to them control of the SmartOffice database. Defendants removed the action to this Court and moved for similar injunctive relief.

In the course of two meetings on June 25 and June 30, 2010, following a mediation session before Magistrate Judge

21

Debra Freeman of this Court, the parties agreed to resolve their respective motions for injunctive relief in a Draft Consent Order as follows:

A.   Defendants conceded that BPP and Schatzki were the sole owners of the EBIX SmartOffice license;

B.   Following a review of the database (i) 1,609 clients were designated as "Schatzki only"; (ii) 547 clients were designated as "Weiser Only"; (iii) 107 individuals and entities were deemed to be "Joint" clients of both WCM and Plaintiffs; (iv) and there were 38 RIA clients;

C.   Data on the 547 clients that were identified as "Weiser Only" would be removed from the SmartOffice database;

D.   Data on the 38 RIA clients would be retained by Defendants until such time as they each provided a written authorization to WCM to transfer their files and access to their data to Plaintiffs;

22

E.  For the 107 clients who were designated as "Joint," Plaintiffs and Defendants would each have access to their information until such time as they made a choice as to who they would do business with in the future, and information on clients who chose WCM would also be deleted from the SmartOffice database if and when they made such a choice;

F.  Plaintiffs were entitled to full and exclusive access to all of the information on the other 10,000+ contacts and prospects whose data appeared on SmartOffice, apart from the information on attorneys and vendors;

G.  After the data was separated, Plaintiffs were to be restored to full access to and control of their SmartOffice database (which did not take place until mid-July 2010);

H.  The paper files on Schatzki's clients would be returned to her;

23

    I.   Schatzki would be given a copy of the electronic
         data on her clients that was stored on the "F"
         drive of WCM's server; and

    J.   BPP  officer  Brian  Edelman  would  meet  with
         Defendant Michel to eliminate their respective
         clients' data from the other party's copy of the
         SmartOffice database.


     On July 7, 2010, WCM delivered one or more computer
discs to Edelman that contained copies of the information on
Schatzki's clients that was stored on the "F" drive of WCM's
server.


     On July 9, 2010, Michel and Edelman met to divide the
data on SmartOffice in accordance with the above-described
agreement.  Two databases were created, a large one for
Plaintiffs and a small one for Defendants, and the client data
was separated. This resolution was reported to the Court.


     According to the Plaintiffs, unbeknownst to Plaintiffs
or this Court, before and during the parties' negotiations for
the resolution of the cross-motions for injunctive relief, and

                              24

while Defendants were representing to this Court that they were suffering great harm because they did not have access to the data on SmartOffice, Defendants surreptitiously copied all of the data in the SmartOffice database, including the information on "Schatzki-only" clients, and uploaded that data onto an alternate database known as ACT!. This assertion is denied by Defendants.

At her July 16, 2011 deposition, Michel testified that she knew who Schatzki's clients were and that SmartOffice data was not transferred to ACT! before she met with Edelman to divide the data on July 9, 2011. However, in June 2010, Michel began corresponding with Dave Worral ("Worral"), an information technology consultant, about transferring the SmartOffice data to ACT!. On June 16, 2010, Worral sent Michel an email outlining the "next steps" for "Phase I" of a project involving the installation of an ACT! database. "Step No. 4" of the "next steps" is as follows: "Carijn will send a copy of the contact data import file to Dave . . . to evaluate. This is scheduled to occur on June 17, 2010."

Plaintiffs contend that on June 17, 2010, Michel emailed Worral as per "step No. 4" of the schedule, attaching a

25

file named "SmartOffice I.csv" containing, inter alia, the contact, family and personally identifiable information for every client and prospect in the SmartOffice database. The Defendants deny the contents of the file.

This action occurred on the same day Defendants moved for injunctive relief, claiming that they had no access to the SmartOffice data.

According to the Plaintiffs, on June 17, 2010, Worral emailed Michel his notes from their phone conversation and acknowledged receipt of the "SmartOffice I.csv" file and noted that the file contained data pertaining to 13,811 contacts. Defendants deny that the email indicated that notes were emailed or Worral acknowledged receipt of the file.

On June 21, 2010, Michel emailed Weisermazars, LLP board member James Blake, CPA, ("Blake") asking Blake to make a $20,000 check available on June 23, 2010 in response to an invoice from Customer Information Technology. On June 21, 2010, Worral emailed a third party consultant, Dan Boehm ("Boehm") asking him to import information from "SmartOffice I.csv" to an ACT! database, to be named "WCM_Main". On June 22, 2010, Michel

26

emailed Worral instructing him to work with Egan Richards to install ACT! onto WCM's server. On June 22, 2010, Worral emailed Michel regarding logistics pertaining to ACT!, and attached a proposed schedule. The schedule provided that within two days, "SmartOffice I.csv" would be imported to ACT! and a sample would be presented for approval. In that same email, Worral specified the "Phase II" of the project would involve another import from SmartOffice at an unspecified date.

According to the Plaintiffs, on June 24, 2010, Worral asked Richards to help Michel download "WCM_Main", which contained the data on "SmartOffice I.csv" onto ACT!. Michel emailed the group announcing her intent to personally install ACT! on the computers of several other WCM employees. The Defendants deny this assertion.

On July 9, 2010, Edelman and Michel met as per the mediated agreement to divide the SmartOffice data. EBIX provided the parties with two identical copies of Smart Office, one for Plaintiffs and one for WCM.

According to the Plaintiffs, Edelman deleted all but approximately 660 contacts from WCM's copy of SmartOffice, and

27

Michel deleted those same 660 contacts from Plaintiff's copy of
SmartOffice. The Defendants deny this assertion.

According to the Plaintiffs, at the meeting, Michel
did not disclose the fact that WCM was retaining a copy of the
"SmartOffice I.csv" file, which at that time was on ACT!. The
Defendants deny this assertion.

On July 13, 2010, Michel emailed Worral five
electronic files, which contained in-depth data, including
insurance policy information and correspondence histories,
pertaining to clients who were designated by the parties as
"Schatzki Only" clients. The Defendants deny the contents of the
files.

On July 19, 2010, Michel emailed Richards and
instructed him to download "the ACT! database with the Smart
Office History in it." On July 20, Richards confirmed that he
had done so. The Defendants deny this assertion.

On July 21, 2010, Worral emailed Michel confirming
that as of July 16, 2010, ACT! contained 12,972 contacts,
greatly exceeding the 660 contacts that WCM was entitled to keep

pursuant to the mediated agreement. The Defendants deny that the number was in excess of the mediated agreement.

Defendants have stipulated that the electronic information pertaining to Schatzki-Only clients remains in Defendants' possession.

Defendants have stipulated that "[t]he contacts, clients and related records contained in Smart Office on May 3, 2010 were transferred to a database known as ACT! prior to the July 7, 2010 Mediation meeting." Defendants have also stipulated and agreed as part of the mediation to delete all data pertaining to non-WCM, non-joint Schatzki-only clients (the "Schatzki Data"), yet retained the Schatzki Data after the July 2010 mediation.

David Katz ("Katz"), who besides Schatzki was the only other registered investment advisor at WCM on May 3, 2010, testified that he never used SmartOffice.

WCM, when it agreed to release Plaintiffs' data pursuant to the mediated agreement, did not obtain written confirmations for the overwhelming majority of Plaintiffs'

29

clients. Such written confirmations were only obtained for thirty-eight (38) of Schatzki's registered investment advisory ("RIA") clients (the "Schatzki RIA Clients"). Defendants deny the paraphrasing of the Draft Consent Order.

M&K reimbursed Schatzki or BPP for the monthly SmartOffice licensing fees while she was an M&K employee. According to Plaintiffs, BPP was reimbursed.

Schatzki managed employees during the course of her M&K employment.

During the course of Schatzki's employment with WCM, she and other WCM employees continued populating the SmartOffice database with client information. According to Plaintiffs, from October 2007 to May 3, 2010, SmartOffice access was limited to people who were under Schatzki's direct supervision and control and employees and partners of Weiser were not given access to SmartOffice.

BPP had numerous ordinary operating expenses, including advertising, auto, bank service fees, dues and subscriptions, business gifts, office supply expenses, seminars

and legal expenses. According to Plaintiffs, these expenses were incurred in 2010 after termination. M&K and WCM reimbursed Schatzki and BPP for the expenses.

According to the Defendants, all employees of WCM were given access to SmartOffice. The Plaintiffs deny that employees other than those working with Schatzki had access to SmartOffice. Plaintiffs note that SmartOffice was password protected.

Schatzki testified at her deposition as follows:

A: I always share information about any of our license
   - - of anything we were using.

Q: Okay. When you say - -

A: Whether it was SmartOffice or anything that we used.

Q: And [WCM] was using SmartOffice, wasn't it?

A: [WCM] was using SmartOffice, [M&K] used SmartOffice.

Q: And you, as the manager of [WCM], instructed the employee to send this to all of the employees in the group, right?

A: Yes. I would normally do it directly. I don't know why I did it.

31

Q: But the point -- not the point. The question is, is
   it  because  you  wanted  the  employees  to  use
   SmartOffice?

A: Everybody was using SmartOffice, yes.

Q: You wanted them to?

A: Yes, we all were. We had to manage our clients that
   way.

Transcript  of  the  June  14,  2011  Deposition  of  Schatzki
("Schatzki Dep. I") at 296:12 to 279:9.


       There  were  no  written  confidentiality  agreements
between  Schatzki  and  any  of  the  people  who  were  using
SmartOffice.


       Maerkle  served  as  Schatzki's  administrative  assistant
while  she  was  employed  by  both  M&K  and  WCM  and  had  access  to
SmartOffice  and  Schatzki's  clients.  Rivers  had  access  to
SmartOffice, and Schatzki instructed Rivers to use SmartOffice.


       Joan  Antoneillo  ("Antoneillo")  was  hired  by  WCM  and
according  to  Plaintiffs  was  recruited  by  Schatzki.  Antoneillo
had  her  own  clients  when  she  joined  WCM.  Antoneillo  put  her

32

clients' information on SmartOffice after she joined WCM. Plaintiffs deny this assertion.

Vicky Sherman ("Sherman") was a WCM employee and was supervised by Schatzki at WCM. Schatzki told Sherman to enter data into SmartOffice.

Elizabeth Cowley ("Cowley") was a WCM employee and Cowley used SmartOffice after Schatzki joined WCM. Plaintiffs allege that Cowley used SmartOffice under Schatzki's supervision.

According to the Defendants, Berlin was the Chief Compliance Officer for WCM prior to Michel taking over this position after Berlin was terminated. Plaintiffs deny this assertion.

David Katz ("Katz") was working for WCM at the time when Schatzki first was employed by WCM and had his own clients. According to the Defendants, Katz was given access to SmartOffice after Schatzki became a WCM employee. Plaintiffs deny this assertion.

Margaret Salacan ("Salacan") was a WCM employee who served as Schatzki's administrative assistant and was supervised by Schatzki. Salacan had access to SmartOffice during the course of her employment with WCM, and Shatzki instructed Salacan to enter contacts and other information onto the SmartOffice database. Plaintiffs allege that Salacan added data into SmartOffice only when directed by Schatzki and for data related to Schatzki's or BPP's clients.

Ellen Shafran ("Shafran") was a WCM employee who had her own clients. Shafran had access to SmartOffice, but only when, according to Plaintiffs, under Schatzki's direct supervision.

Schatzki never had any WCM employee sign any non-compete confidentiality agreements. According to Plaintiffs, oral agreements on confidentiality and regulatory compliance were reached.

Defendants assert that Schatzki did not take any actions to keep the processes confidential. Plaintiffs deny this assertion.

34

Schatzki never prohibited anyone from contacting her clients when she was employed by WCM. Plaintiffs deny this assertion.

BPP did not have any WCM employees sign confidentiality agreements. Plaintiffs deny this assertion.

Schatzki provided the following testimony at her deposition:

Q: Let's go to Paragraph 66 of your Complaint. "Plaintiffs files contain confidential and proprietary information which Plaintiffs Schatzki and BPP assembled over many years and at great expense." Do you see that?

A: Yes.

Q: You shared that confidential information with [WCM], right?

A: I am not sure.

Q: Well, you put it on a database, right?

A: Some of it. Some of it was old.

Q: Some of it was old?

A: Some of my clients were with me for 30 years.

35

Q: Right.

A: I still have original clients.

Q: But that so-called confidential, proprietary information was shared with [WCM], right?

A: If the folder was in the office, yes.

Q: And if it was on SmartOffice, it was shared?

A: Yes.

Q: You did nothing to keep these people from stealing your clients?

A: No. I would never even think that way. I would leave my pocketbook out in this room. I don't think that anybody is going to steal what I have in my pocketbook.


Schatzki Dep. I at 308:5 to 309:11.


        Shortly after Schatzki was terminated, Michel called EBIX, the licensor of the SmartOffice system, and changed WCM's login to the SmartOffice database to protect the client information from unauthorized access by Schatzki, who was no longer an employee of WCM. Defendants contend that when Michel changed the login to the SmartOffice database, she was following the same "procedure" that WCM followed "for every single

36

employee." Plaintiffs deny this assertion. According to Plaintiffs, Michel changed BPP's login information, and impermissibly changed the name of the account to "WCM". Plaintiffs allege that in order to effectuate the co-opting of BPP's database, Michel represented to EBIX that she was acting for BPP, and that Michel later admitted that she was acting as a WCM agent when she changed the SmartOffice password and took this action to cut off Schatzki and BPP from their clients.

According to the Defendants, although some of the clients on SmartOffice did not require the protection of federal and state privacy laws, as a practical matter there was no immediate way to separate the data following Schatzki's termination, and all of the data had to be protected before it could be separated. According to Plaintiffs, the SmartOffice data could have been segregated in a few hours; Edelman offered to work with EBIX and WCM to effectuate a partition of the database which contained over 10,000 clients, contacts and prospects who Schatzki had added to the database before joining WCM and pursuant to the mediated agreement and the parties eventually segregated the data in a number of hours.

After WCM changed the log-in information to protect the client data that was subject to privacy laws against unauthorized disclosure, WCM began the process of reviewing and separating the client data that was not subject to any laws against unauthorized disclosure. Plaintiffs deny this assertion.

Michel obtained a copy of the client information on the SmartOffice system to determine which clients belonged to WCM and which belonged to Schatzki so that the client information belonging to Schatzki could be returned to her. Plaintiffs deny this assertion.

Schatzki received a list of her clients with contact information from WCM when she came into WCM's office to pick up her boxes. According to Plaintiffs, the list was outdated, incomplete and inaccurate.

WCM sent twenty (20) RIA clients a release form, in which the RIA client was given a choice to either remain a client of WCM or release their confidential information to Schatzki. According to Plaintiffs, the forms were sent after the initiation of this action and after Plaintiff's moved for injunctive relief.

38

Defendants state that on May 18, 2010, EBIX terminated WCM's access to the SmartOffice database. Plaintiffs deny this assertion.

Defendants assert that WCM had access to SmartOffice for 15 days, from May 3, 2010 to May 18, 2010, when EBIX terminated WCM's access. Plaintiffs deny this assertion. Plaintiffs assert that WCM's access to the database was terminated on May 28, 2010.

On May 19, 2010, Schatzki had access to her client information on the SmartOffice system. According to Plaintiffs, on May 19, 2013, EBIX gave Schatzki very limited access to SmartOffice; that access allowed Schatzki only to see contact information, but nothing about policies, histories, etc. As a result, Schatzki was therefore unable to provide any services to clients.

Schatzki also had access to limited client information within 24 to 48 hours after her termination because Edelman downloaded her outlook calendar from her WCM computer. Plaintiffs deny this assertion.

39

On May 19, 2010, Schatzki called some clients whose information she had gained from access to the SmartOffice system. According to Plaintiffs, she only had the contact information and could not provide services.

Of all the clients that Schatzki called and spoke with on May 19, 2010, none of them decided to stay with WCM; all decided to leave with Schatzki.

Shortly after Schatzki gained access to SmartOffice on or about May 19, 2010, EBIX terminated her access to SmartOffice. Plaintiffs deny this assertion.

Defendants allege that Schatzki had full access to her clients' information by July 1, 2010. After July 2010, more than half of Schatzki's clients transferred from WCM to Schatzki. Plaintiffs deny this assertion; Plaintiffs allege that Schatzki did not have full access to her clients' information until the SmartOffice data was partitioned on July 9, 2010 and receipt of her paper files in August.

40

Schatzki could not name any of her clients that stayed with WCM and refused to go with her. Plaintiffs deny this assertion as incomplete.

Not all of the clients on the SmartOffice system belonged to Schatzki; she testified that some of the clients "didn't [sic] belong to me." Plaintiffs deny this assertion as incomplete.

Defendants note that maintaining the clients' confidentiality information was important to WCM. Plaintiffs deny this assertion as incomplete.

Shatzki provided the following testimony at her deposition:

Q. Did you ask for any compensation to place "Building, Protecting and Preserving Wealth for Generations" on this business plan?

A. Yes. We were always going to have to be compensated 10 percent of the gross revenue over and above.

Q. Is that in writing?

41

A. No. It was never in writing with Marcum & Kliegman
   or with Resnick or any other firm I worked with
   either.

Q. What was the length of time that alleged contract
   was to take place?

A. Forever.

Q. Forever?

A. Forever. As long as they used it.

Schatzki Dep. I at 138:23 to 139:12. Plaintiffs deny this
assertion as incomplete.

WCM paid Schatzki a discretionary bonus in the amount
of $152,173.00, which was more than $133,965.09, the amount that
she would have received had she been entitled to a ten percent
fee for the revenue generated in the first year of employment.
Plaintiffs deny this assertion.

WCM was operating at a loss in 2007, 2008 and 2009.
Plaintiffs deny this assertion as incomplete.

BPP did not file partnership tax returns. Plaintiffs
deny this assertion as incomplete.

42

BPP is still in existence, and is currently operating and generating income.

The RIA clients had agreements with WCM. According to Plaintiffs, the Schatzki RIA Clients had agreements with WCM while she was at WCM.

## The Summary Judgment Standard

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. Westinghouse Elec. Corp. v. N.Y. City Transit Auth.,

43

735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting Anderson, 477 U.S. at 249. Moreover, if the evidence for the nonmoving party is a mere scintilla or "not significantly probative," the court may grant summary judgment. Anderson, 477 U.S. at 249-50. A fact is "material" only if it will affect the outcome of the suit under applicable law, and such facts "properly preclude the entry of summary judgment." Id. at 248. Disputes over irrelevant facts will not preclude summary judgment. Id. The goal is to "isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

While the moving party bears the initial burden of showing that no genuine issue of material fact exists, Atl. Mut. Ins. Co. v. CSX Lines, L.L.C., 432 F.3d 428, 433 (2d Cir. 2005), in cases where the non-moving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. "It is ordinarily sufficient for the movant to point to a lack of evidence . . . on an essential element of the non-movant's claim . . . . [T]he nonmoving party must [then] come forward with admissible evidence sufficient to raise a genuine issue of fact

44

for trial . . . ." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140,
145 (2d Cir. 2008) (internal citations omitted); see also
Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18
(2d Cir. 1995) ("Once the moving party has made a properly
supported showing sufficient to suggest the absence of any
genuine issue as to a material fact, the nonmoving party . . .
must come forward with evidence that would be sufficient to
support a jury verdict in his favor").

## I.   The Motions With Respect To Plaintiffs' Conversion Claims Are Denied

The Defendants have moved to dismiss the Plaintiffs'
conversion claim on the basis that (1) they were entitled to
keep the database because certain entries related to WCM clients
and (2) their obligations under Regulation S-P required the
retention of the database. The Plaintiffs cross moved seeking
summary judgment on the conversion claim. Both motions are
denied.

### a.   The Plaintiffs' Database Was Converted

To establish a claim for conversion, a plaintiff must
establish (1) title to the converted property; or a right to

45

possession of that property; (2) an act of conversion by the defendant; and (3) damages caused by the conversion. Simon v. Weaver, 327 F. Supp. 2d 258, 262 (S.D.N.Y. 2004) (citing Brass v. Am. Film Tech., Inc., 780 F. Supp. 1001, 1003 (S.D.N.Y. 1991)); see also Jaffe v. Capital One Bank, No. 09 Civ. 4106 (PGG), 2010 WL 691639, at *7 (S.D.N.Y. March 1, 2010). The facts set forth that BPP was the sole licensee of SmartOffice and Schatzki had compiled the majority of the SmartOffice data. Courts adjudicating conversion of electronic files have held that the compiler of the data has a possessory right or interest in these materials unless an employment or other agreement states otherwise. See Thyroff v. Nationwide Mutual Ins. Co., 460 F.3d 400, 404-05 (2d Cir. 2006); Shmueli v. Corcoran Group, 802 N.Y.S.2d 871, 874-75 (N.Y. Sup. Ct. 2005).

In addition to showing a possessory right or interest, the plaintiff must establish that the defendant's dominion over or interference with the property violated the plaintiff's rights. Colavito v. N.Y. Organ Donor Network, Inc., 860 N.E.2d 713, 717 (N.Y. 2006). With respect to electronic records, such a violation occurs when someone acts to block the interest holder from accessing his or her electronic data. See Thyroff v. Nationwide Mut. Ins. Co., 864 N.E.2d 1272, 1278 (N.Y. 2007)

46

(noting that conversion can occur through the deletion of data or the transfer of electronic data away from a computer); Shmueli, 802 N.Y.S.2d at 873, 874-77. Michel, under instructions from WCM, locked Plaintiffs out of SmartOffice by instructing EBIX to change the database's password.

Where a defendant's original possession was lawful, a conversion does not occur unless the defendant refuses to return the property after the plaintiff makes a demand. See Seanto Exports v. United Arab Agencies, 137 F. Supp. 2d 445, 451 (S.D.N.Y. 2001). Here, the Plaintiffs made the requisite demands for SmartOffice access and the return of the paper files and the "F" drive. Recognizing that SmartOffice contained some information pertaining to WCM-only clients and Schatzki RIA Clients, the Plaintiffs offered to work with Defendants to partition the data. However, Plaintiffs were unable to access the SmartOffice database, "F" drive and paper files for some amount of time. Thus, Defendants dominion over the SmartOffice database constituted conversion.

      b.   Regulation S-P Does Not
           Justify Defendants' Refusal

Regulation S-P requires certain institutions to obtain consent from certain clients before personally identifiable information can be transferred to an unaffiliated third party. See 17 C.F.R. § 248.10. This requirement applied to only the 38 Schatzki RIA Clients out of Plaintiffs' 1,754 clients. When the parties finally partitioned SmartOffice in July 2010, WCM only required written releases for these 38 clients; the remainder of Plaintiffs' data was released to them without any such releases.

Regulation S-P only governs "brokers, dealers, and investment companies, as well as to investment advisers that are registered with the [Securities and Exchange] Commission." 17 C.F.R. § 248.1. It obliges these groups to protect the non-public personal information of individual consumers who have a customer or client relationship with those institutions. See 17 C.F.R. § 248.10. Regulation S-P does not protect the non-public information of companies or individuals who obtain financial products for business, commercial or other purposes. The regulation also does not apply to data relating to individuals or entities that were merely prospects or business contacts as opposed to customers. Regulation S-P does not apply to clients who used an organization's services solely to obtain insurance, estate planning or wealth management planning that did not

48

involve the purchase or sale of securities. See Privacy of
Consumer Financial Information (Regulation S-P), 65 F.R. 40334,
40335 (June 29, 2000) ("[T]he final rule excludes the provision
of insurance by a broker-dealer, fund, or registered advisor
from the scope of Regulation S-P.").

Plaintiffs' only clients who fell under Regulation S-P
were the 38 Schatzki RIA Clients and Schatzki's broker-dealer
clients ("Schatzki Broker-Dealer Clients"). The Schatzki RIA
Clients had service agreements with WCM, which was an RIA. The
38 Schatzki RIA Clients were the only Schatzki clients who had
to give WCM written consent before their information could be
released to Plaintiffs.

On May 10, 2010, Smith, WCM's broker-dealer,
instructed Michel in writing that Regulation S-P required WCM to
prevent its employees from accessing the personal and financial
information of Schatzki-only broker-dealer clients. On May 14,
2010 and May 16, 2010, in an effort to quell WCM's regulatory
concerns about restoring Plaintiffs' SmartOffice access, BPP
shareholder Edelman, through counsel, emailed a proposed
solution to Defendants' counsel. Edelman suggested that WCM
permit EBIX to duplicate SmartOffice. Pursuant to Edelman's

proposed "script", contacts added since Plaintiffs' May 3, 2010 departure, Weiser RIA clients and WCM clients who had no relationship with Schatzki would be deleted from Schatzki's copy of SmartOffice. Furthermore, all contacts and insurance/annuity policies created prior to Schatzki's date of hire at WCM, with the exception of Weinstock's clients, would be removed from WCM's copy of SmartOffice. After Defendants' representatives expressed resistance to this solution, Plaintiffs' counsel offered to quarantine data pertaining to Schatzki's RIA clients.

Defendants had the capacity to identify RIA Clients. When the Court suggested a partitioning of the data during the injunctive phase of this litigation, the parties were able to identify their clients in a matter of hours. Even if Defendants required consent from the 38 Schatzki RIA Clients, Regulation S-P did not compel Defendants' denial of Plaintiffs' access for the remaining clients.

Defendants' reliance on In re S.W. Bach & Co. and Alpha Funding Group v. Continental Funding, LLC is misplaced. See In re S.W. Bach & Co., 435 B.R. 866 (Bankr. S.D.N.Y. 2010); Alpha Funding Group v. Continental Funding, LLC, 848 N.Y.S. 2d 825 (N.Y. Supp. 2007). Both In re S.W. Bach & Co. and Alpha

Funding involved the transfer of customer information from one broker-dealer to another. In the case at bar, WCM was not a broker dealer; neither was BPP.

Defendants' reliance on 11 NYCRR § 420.17 and N.J.S.A. 17:23A-13 is also misplaced. Schatzki and BPP are also insurance licensees, and under New York law, absent a contract to the contrary, an independent insurance agent's customer information belongs to that agent, not the organization for which he or she worked. See Estate of Coming, 108 A.D.2d 96, 99-100 (N.Y. App. Div. 1985) ("[I]t is the custom and practice in the insurance field that, in the absence of a contract to the contrary, the independent insurance agent owns the expirations at the termination of his agency."); see also Nat'l Fire Ins. Co. of Hartford v. Sullard, 97 App. Div. 233, 238-39 (2d Dept. 1904).

In Brownstone Agency Inc. v. Distinguished Programs Group, a New York court held that an insurance program administrator was unlikely to succeed on the merits of its conversion claim relating to insurance customer information. Brownstone Agency Inc. v. Distinguished Programs Group, 0600751/2008, 2008 NY Slip Op 32131(U) (Sup. Ct. July 29, 2008). The court noted that "even if a proprietary right in an entity's

customer's expirations exists, those rights would likely belong to the retail brokers, not the program administrator or insurance company." Id. As retail brokers, Schatzki and BPP own the information pertaining to their insurance customers.

Accordingly, no insurance regulation authorized WCM to block Plaintiffs from their client data, since Plaintiffs were insurance licensees themselves who had individual relationships with their clients.

### c.   A Factual Dispute Exists With Respect To Conversion Damages.

The Defendants have denied the facts on which the Plaintiffs rely to establish damages. The evidence Defendants dispute is not a mere "scintilla," and this factual dispute requires the denial of Plaintiffs' cross motion for summary judgment.

## II.  **The Motion To Dismiss The Civil Conspiracy Claim Is Denied**

The Defendants again have moved to dismiss the Conspiracy claim on the grounds that (a) there is no underlying tort claim and (b) Michel was a WCM employee when she committed

the acts establishing the conspiracy as well as the underlying tort of conversion.

New York law recognizes a cause of action for civil conspiracy where that cause of action is linked to other alleged torts. World Wrestling Federation Entm't v. Bozell, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001). To prevail on a claim of civil conspiracy, as an initial threshold, a plaintiff must demonstrate a primary underlying tort from which the conspiracy claim derives. See Sepenuk v. Marshall, No. 98 Civ. 1569 (RCC), 2000 WL 1808977, at *6 (S.D.N.Y. Dec. 8, 2000). Without an independent tort, there can be no claim for civil conspiracy. See Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006); Alexander & Alexander of N.Y., Inc. v. Fritzen, 503 N.E.2d 102, 102 (1986). In addition to the primary tort, a plaintiff must prove the four essential elements of a conspiracy claim: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. World Wrestling Federation, 142 F. Supp. 2d at 532.

53

This Court previously denied Defendants' summary judgment motion on the conspiracy claim in the January 2012 Opinion. See Schatzki v. Weiser Capital Management, LLC, No. 10 Civ. 4685 (RWS), 2012 WL 169779, at *8 (S.D.N.Y. Jan. 19, 2012). In the previous motion, Defendants had two arguments regarding conspiracy. First, Defendants argued that Plaintiff's civil conspiracy claim had to be dismissed because the only tort claim that Plaintiffs alleged was conversion, and Plaintiff's conversion claim fails as a matter of law. Second, Defendants argued that a corporation cannot conspire with its agents or employees acting within the scope of its employment, and since Michel is an employee of WCM and Weiser is WCM's parent company, a civil conspiracy claim cannot occur. Id. This Court held: (1) because Defendants' summary judgment motion for conversion had been denied, the conspiracy claim survived the motion; and (2) there was a genuine issue of material fact concerning whether the alleged conspiracy to commit Plaintiff's property occurred during a time when Michel was not employed at or acting as an employee of WCM. Id.

Here, the conversion claim remains to be litigated as held above. Further, whether Michel was acting as a WCM agent and within the scope of her employment at the time of the

54

alleged conspiracy to convert Plaintiffs' property remains a genuine issue of material fact that is not appropriate to settle at the summary judgment stage. The civil conspiracy claim remains and the Defendants' summary judgment motion on the claim is denied.

### III. The Motions With Respect To The Unjust Enrichment Claim Are Denied

Under New York law, the measure of damages for an unjust enrichment claim "is restricted to the 'reasonable value' of the benefit conferred upon the defendants," Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 813 F. Supp. 2d 489, 534 (S.D.N.Y. 2011), and is "measured by a defendant's 'unjust gain, rather than [by a plaintiff's] loss,'" Pereira v. Farace, 413 F.3d 330, 340 (2d Cir. 2005). Plaintiffs' assertions regarding whether Defendants kept a complete copy of Plaintiffs' SmartOffice data have been disputed as set forth above. The testimony of Plaintiffs' damages expert, Donnelly, has been challenged by Defendants' in limine motion. The Plaintiffs have also urged damage theories based on joint venture concepts that are also challenged factually as well as legally by the Defendants. These conflicts bar summary judgment dismissing or granting the unjust enrichment claim.

55

## IV.   The Plaintiffs' Contract Claim For Commissions Is Dismissed

Schatzki seeks commissions that she alleges was owed for 2009 and 2010 under an oral contract; no evidence of a written contract has been adduced. The Defendants deny the existence of any such agreement and contend no written contract existed.

Under the New York Statute of Frauds, an oral contract is void where full performance is not possible within a year. See N.Y. Gen. Oblig. Law § 5-701(a)(1) (McKinney 2002) (stating that an oral agreement is void if "[b]y its terms is not to be performed within one year from the making thereof"). Because an at-will employment relationship can be terminated at any time, courts have held that at-will contracts survive the one-year requirement. Guilbert v. Gardner, 480 F.3d 140, 151 (2d Cir. 2007). In order for an at-will contract to survive the one-year requirement, the measure of compensation must become "fixed and earned" within the one year. Cron v. Hargro Fabrics, Inc., 694 N.E.2d 56, 60 (N.Y. 1998).

56

Schatzki has relied on Ryan v. Kellogg Partners
Institutional Servs., 968 N.E.2d 947 (N.Y. 2012). However, in
that case, the alleged promise could have very clearly been
performed within one year, because it was a promise to pay a
certain amount of compensation plus a discretionary bonus for a
single year of employment. The alleged oral contract survived
the statute of frauds because it was capable of becoming fixed
and earned within one year. Id. at 15.

If the alleged oral contract between the parties was
allegedly made at the commencement of Schatzki's employment with
WCM in 2007, then the only compensation capable of becoming
fixed and earned within one year would be the monies allegedly
due to her in 2008, which she has received. In addition,
Schatzki stated in her deposition that the alleged oral contract
was to take place "forever." Schatzki Dep. I at 138:23-139:12.
An oral contract that calls for performance of indefinite
duration, even if terminable within one year only by its breach,
is not enforceable under the statute of frauds. See D'Esposito
v. Gusrae, Kaplan & Bruno PLLC, 844 N.Y.S.2d 214 (N.Y. Sup. Ct.
2007) (alleged oral contract was unenforceable under Statute of
Frauds because the plaintiff claimed that his right to a
partnership was to have continued indefinitely even after he

57

left the firm and that it was terminable within one year of its inception only by a breach), leave to appeal dismissed, 888 N.E.2d 388 (2008).

The cases Schatzki has relied on involved oral contracts that could be performed within one year. See Caruso v. Malang, 673 N.Y.S.2d 470 (N.Y. App. Div. 1998); Gold v. Benefit Plan Adm'rs, 649 N.Y.S.2d 482 (N.Y. App. Div. 1996); Murphy v. CNY Fire Emergency Servs., 639 N.Y.S.2d 628 (N.Y. App. Div. 1996). In White v. Purchasing Support, Inc., 671 N.Y.S.2d 384 (N.Y. App. Div. 1998), the court did not discuss the facts of the case in its opinion and affirmed on the trial court's opinion below.

Because Schatzki's contract claim is based on an oral agreement that called for performance of an indefinite duration, it is barred by the Statute of Frauds.

**V.    The Defendants' Motion to Dismiss For Failure To Join An Indispensible Party Is Denied**

Defendants assert that EBIX was the party who terminated WCM's access to SmartOffice on May 18, 2010 and then, on or about May 19, 2010, terminated Plaintiffs' access to

58

SmartOffice. Defendants argue that the damages that Plaintiffs have sustained after May 18, 2010 do not flow from WCM's conduct but the conduct of EBIX, and Plaintiffs failed to join EBIX in this action, an indispensible party.

Fed. R. Civ. P. 19(a)(1) states:

A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties . . . .

If Rule 9(a) is satisfied, the court will consider whether a dismissal under Rule 19(b) is warranted. Fed. R. Civ. P. 19(b).

While EBIX's actions relate to Plaintiffs' conversion claims, EBIX expressed a willingness to help the parties partition the data. EBIX cut off Plaintiffs' limited access only after WCM threatened legal action against EBIX. Moreover, EBIX also did not control the "F" drive files and paper files that remained in WCM's possession until August 2010. EBIX was also not complicit in the copying and transfer of the "SmartOffice

59

I.csv" file. It was WCM's actions that prevented Plaintiffs from being able to access the SmartOffice database. Even if EBIX could be characterized as a joint tortfeasor, such characterization would not transform EBIX into a necessary party under Rule 19. See Temple v. Synthes Corp., 498 U.S. 5, 8 (1990) (explaining that "it has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit"). Given such, EBIX is not an indispensible party under Rule 9.

**Conclusion**

As set forth above, the motions for summary judgment with respect to the conversion and unjust enrichment claims are denied, the motions to dismiss for civil conspiracy and failure to join an indispensible party is denied and the motion for summary judgment and dismissal of the contract claim is granted.

It is so ordered.

New York, NY
November 25, 2013

_____
ROBERT W. SWEET